---

(91 App. Div. 131.)

## In re McELHENY.

## In re E. L. GOODSELL CO.'S ESTATE.

### (Supreme Court, Appellate Division, First Department.   February 5, 1904.)

1. BANKS—LETTERS OF CREDIT—COMMERCIAL CORRESPONDENT—ADVANCEMENT
OF MONEY—SECURITIES—PROPERTY PURCHASED—TITLE.
    Where a bank acted as a commercial correspondent for a corporation,
advancing money or credit to the corporation for the purchase of fruit,
and taking bills of lading as security for such advances, the title to the
goods vested in the bank, subject to a contract on its part to sell the same
to the corporation on receipt of the purchase price.

2. SAME—CREDIT OBLIGATION—CONSTRUCTION.
    A contract for the issuance of a letter of credit recognized the bankers'
right to possession and disposal of all goods purchased under the letter,
together with their right to possession of all bills of lading and policies
of insurance on such goods until such time as any indebtedness in their
favor against their principal should be discharged, and declared that any
proceeds of goods coming into the hands of the bankers should be applied
against the acceptances of their principals under the letter of credit, or
against "any other indebtedness" or orders from their principal, including
"all expenses incurred," etc., and that the obligation should continue and
be applicable to "all transactions."   Held, that where a cargo of fruit pur-
chased under such letter of credit was lost, and the bankers, with others,

held policies of insurance thereon, they were entitled to a lien on a proportionate amount of the fund subsequently received in a settlement of the insurers' liability, to secure an indebtedness of their principal arising from future transactions.

Appeal from Special Term, New York County.

Judicial accounting by Victor K. McElheny, Jr., as assignee, etc., of the estate of the E. L. Goodsell Company. From so much of an order as confirmed a part of the assignee's account, disallowing a claim of Brown Bros. & Co. to a proportionate share in a special fund deposited with the assignee, they appeal. Reversed.

Respecting essential facts there is no dispute. Prior to July 3, 1896, E. L. Goodsell Company, a foreign corporation existing under the laws of West Virginia, was carrying on the business in the city of New York of purchasing and selling fruit at public auction, imported from Italy and Sicily. In carrying on such business the corporation procured open letters of credit from Brown Bros. & Co., a firm of bankers of London, England, and also letters of credit from other banking firms. The letters of credit were made in favor of persons residing at the place where the fruit was purchased, and authorized the shippers to draw upon the correspondent therein named for the purchase price of the fruit. The shippers in Italy and Sicily in each case drew drafts under these letters of credit upon the respective banking houses, accompanied by bills of lading. The banking houses then paid the drafts, and in turn presented them to the E. L. Goodsell Company, which company, upon paying the drafts, received the bills of lading, and possession of the fruit. In November, 1895, E. L. Goodsell Company made application to Brown Bros. & Co. for letters of credit to four different persons in Italy and Sicily, and such letters were accordingly issued by Brown Bros. & Co., and they paid drafts to such persons under these letters of credit, amounting to $4,917.-75. These drafts were drawn against bills of lading for lemons and oranges which were placed for shipment on board the steamship Angerton at Palermo, Sicily. These drafts came forward in usual course to New York, and were paid in full by the E. L. Goodsell Company, and it received the bills of lading from Brown Bros. & Co. for the fruit. They, however, never received the merchandise represented by the bills of lading, as the steamship was wrecked off Gibraltar on December 2, 1895, and that part of the cargo which was saved was sold in foreign parts. None of it ever reached the city of New York. In connection with the letters of credit issued by Brown Bros. & Co. the E. L. Goodsell Company executed a contract, called a "credit obligation," in form as follows: "Received the Letter of Credit, of which the annexed is a copy, for Two thousand pounds Sterling, in consideration whereof we, E. L. Goodsell Co., W. W. Flannagan and E. L. Goodsell jointly and severally hereby agree with Messrs. Brown, Shipley & Co. and with Messrs. Brown Brothers & Co., respectively, to provide, previous to the maturity of the bills drawn in virtue of said credit, sufficient funds in cash or in satisfactory bills on London, at not exceeding sixty days' sight, endorsed by us, to meet the payment of the same, together with a commission of one-half of one per cent. on drafts drawn at sight to sixty days or two months, three-quarters of one per cent. on drafts drawn at ninety days or three months, one per cent. on drafts drawn at four months, and one and one-half per cent. on drafts drawn otherwise.

"It is understood that moneys paid to Brown Brothers & Co. shall be taken as a payment without recourse, and that in all settlements arising under this credit, the pound sterling shall be calculated at the current rate of exchange at the time of such settlement.

"It is further understood that each draft is to be settled to a point, with commission as above, and interest adjusted in a net rate of exchange at the time of payment. In the event, however, of settlements not being so made to a point, then Messrs. Brown, Shipley & Co. are to furnish their account current semiannually, charging interest at the rate of five per cent. per annum or at the current rate if it be above that.

"And we hereby recognize and admit the ownership of Brown, Shipley & Co. in, and their right and that of Brown Brothers & Co. to, the possession and disposal of all goods and the proceeds thereof, for which Brown, Shipley & Co. may come under any engagements in virtue of this credit, as also to the possession of all bills of lading for and policies of insurance on such goods, until such time as any indebtedness or liability existing as against us in favor of Brown, Shipley & Co. or Brown Brothers & Co. under the said credit or otherwise shall have been fully paid up and discharged. And in the event of either of them hereafter entrusting said goods to us for the purpose of sale or otherwise we hereby consent that their right to repossess themselves of the same or of any proceeds thereof may be exercised at their discretion.

"Any proceeds of said goods coming into their hands are to be applied against the acceptances of Brown, Shipley & Co. under this credit, or against any other indebtedness of ours to them or Brown Brothers & Co. including all expenses incurred by either of them and commissions of sale and guarantee.

"This obligation is to continue in force, and to be applicable to all transactions, notwithstanding any change in the individuals composing the respective firms parties to or concerned in this contract, or either of them, or in that of the user of this credit, whether such change shall arise from the accession of one or more new partners, or from the death or secession of any partner or partners.

"Confirmation of this credit has been telegraphed through Brown, Shipley & Co. London, at our request and sole risk.

"Dated New York, November 18, 1895.

"[Signed]                    E. L. Goodsell Co.
                               "W. W. Flannagan.
                               "E. L. Goodsell."

The letters of credit were issued upon the execution of this agreement. The E. L. Goodsell Company also procured letters of credit under a similar arrangement from two other banking firms for different consignments of fruit, which were shipped upon the Angerton, and the drafts drawn thereunder were paid by two other bankers—one of $4,136 and the other of $2,343.84. E. L. Goodsell Company also paid these drafts and received the bills of lading therefor. Some two years prior to the issuance of the letters of credit above described, Edward L. Goodsell, whose interest became subsequently merged in the corporation, had taken out with the Thames Mersey Marine Insurance Company an open policy of insurance for £1,000 sterling, dated December 14, 1893, which provided, loss payable to "Brown Brothers & Co. as interest may appear." This policy of insurance always remained in the possession of Brown Bros. & Co. until it was delivered by them to the assignee under a stipulation to be mentioned hereafter. Exactly similar policies were taken out to cover the shipments made under the letters of credit issued by the two banking firms. After the loss of the Angerton, Brown Bros. & Co. still continued to do business with the E. L. Goodsell Co. down to July 3, 1896, when the corporation made an assignment for the benefit of creditors to Victor K. McElheny, Jr., and at the time of such assignment the corporation was indebted to Brown Bros. & Co. in the sum of $21,798.67, no part of which last-mentioned sum has been paid. The insurance company disputed its liability for the full amount of the insurance represented by the policies, but after negotiations it agreed to pay the sum of $5,500, as the total loss incurred on account of the wreck, but refused to pay such sum unless Brown Bros. & Co. would surrender the policy of insurance which they then held. The assignee made application to Brown Bros. & Co. for the policy. They refused to surrender the same unless the whole sum secured and agreed to be paid thereby was paid to it. It was finally stipulated between the parties in interest that $500 of the sum agreed to be paid by the insurance company should be paid to the attorneys who effected the settlement, and that the remaining sum of $5,000 be deposited with the Continental Trust Company of New York to the credit of Victor K. McElheny, Jr., as assignee, etc., as a special fund, subject to the conflicting claims thereto; that he would hold such sum until such claims should be determined, and make distribution of the same in accord-

ance with the determination. It is the contention of Brown Bros. & Co. that they are entitled to receive that proportion of the $5,000 deposited as aforesaid which their claim bears to the aggregate claims of the bankers for whose benefit the policies were issued, which sum would amount to $2,239.59, with interest at 2 per cent. from the date of the deposit with the trust company. The assignee claims that Brown Bros. & Co. are entitled to no part of the fund. The referee sustained the contention of the assignee, and directed that the claim of Brown Bros. & Co. be rejected, and that the fund be divided among the general creditors of the assignor. From the order entered upon the confirmation of the report of the referee, this appeal is taken.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

Willard Parker Butler, for appellant.

William M. Bennett, for respondent.

HATCH, J. While Brown Bros. & Co. were bankers, yet the relation which existed between that firm and the corporation was quite different from that which exists between a banker, as such, and a depositor, in the ordinary course of a strict banking business. In such relation a lien "attaches in favor of the bank upon the securities and moneys of the customer deposited in the usual course of business, for advances which are supposed to be made upon their credit. It attaches to such securities and funds, not only against the depositor, but against the unknown equity of all others in interest, unless modified or waived by such agreement, express or implied, or by conduct inconsistent with its assertion." Meyers v. N. Y. Nat. Bank, 36 App. Div. 482, 55 N. Y. Supp. 504; Smith v. 8th Ward Bank, 31 App. Div. 6, 52 N. Y. Supp. 290. The relation existing between Brown Bros. & Co. and the corporation, strictly speaking, was that of a commercial correspondent advancing money or credit to a principal for the purchase of property for the principal, and taking therefor, as security for the advances, the bills of lading. Under such circumstances, it has been held that the title to the goods so purchased vests in the correspondent, subject, however, to a contract upon his part to sell the same to the principal upon receipt of the purchase price. Drexel v. Pease, 133 N. Y. 129, 30 N. E. 732. It is not important, in the disposition which we make of this case, however, to determine which rule applies, for, if the relation was that strictly of banker and customer, a lien would attach to the money and securities on hand, which might be enforced for any indebtedness existing at the time of any default in payment of matured obligations. So, likewise, it was held in the case last cited that an agreement for a general lien between the correspondent and the principal would in like manner be perfectly good, and would be enforced to the same extent. The question is important in the present case, in view of the conclusion reached by the learned referee, for, in construing the credit obligation, which was executed at the time of the issuance of the letters of credit, he has limited its effect, and has not extended its operation beyond what would have been the rights of Brown Bros. & Co., had there been no agreement. The rule applied would be the same in an ordinary agreement for a lien, arising out of a single transaction of purchase, which could only be enforced to the extent of a present indebtedness. In disposition of the

case, therefore, the controlling question necessarily is the construction of the credit obligation. It appeared from the evidence that, when the drafts were paid for the cargo shipped by the wrecked steamer, there was no indebtedness existing in favor of Brown Bros. & Co. against the corporation, and no indebtedness was incurred until about six months after the payment of the drafts which had been drawn on account of such cargo. That specific transaction was then closed, and, had the money then been paid upon the insurance policy, there would have been no indebtedness in favor of Brown Bros. & Co., and consequently no lien to be enforced. The question, therefore, is, did the credit obligation create in favor of Brown Bros. & Co. a lien upon the policy for future indebtedness, which might be enforced against the fund secured to be paid thereby when paid? In construing the credit obligation, we are to give force and effect to its entire language, in order to arrive at the intent of the parties in executing it. In precise terms, it says:

"And we hereby recognize and admit the ownership of Brown, Shipley & Co. in and their right * * * to the possession and disposal of all goods and the proceeds thereof, for which Brown, Shipley & Co. may get under any arrangements in virtue of this credit, as also to the possession of all bills of lading for and policies of insurance on such goods, until such time as any indebtedness or liability existing as against them in favor of Brown, Shipley & Co. or Brown Brothers & Co. under the said credit or otherwise shall have been paid up and discharged. * * * *Any* proceeds of said goods coming into their hands are to be applied against the acceptances of Brown, Shipley & Co. under this credit, or against *any* other indebtedness of orders to them or Brown Brothers & Co. including *all* expenses incurred by either of them and commissions of sale and guaranty. This obligation is to continue in force and to be applicable to *all* transactions."

It is evident that this language covers all transactions between the parties relating to the subject-matter, and gave to Brown Brothers & Co. the right to secure from any property or securities in its hands payment of its indebtedness, without regard to when it arose. If at the time Brown Bros. & Co. held property or securities of the corporation, and an existing debt was then due and owing to them, the contract applied to and covered it. Its express language is to make it applicable "to all transactions" and to "any" indebtedness or liability existing. It would be difficult to use words which create with more certainty a continuing obligation. In comprehension, it embraced all transactions during the life of the obligation—past, present, and future. It is impossible by any fair construction of the terms of this instrument to limit the right of Brown Bros. & Co. to any single transaction. In Agawam Bank v. Strever, 18 N. Y. 502, the language of the memorandum which accompanied the obligation was, "The above note is left as collateral security for all liabilities incurred by * * * to the Agawam Bank." The court held that in strict grammatical construction the word "incurred" was used in the past tense, and, strictly speaking, was limited to such indebtedness as existed at the time of the delivery of the contract. Yet the court held that, in view of the circumstances, it was not justified in placing such limited significance upon the language, or in construing it in its strict grammatical sense; that, construing it according to the evident intention, it constituted the se-

curity a continuing obligation for debts created after its delivery; and such is the effect of the cases. Merchants' Nat. Bank of Whitehall v. Hall, 83 N. Y. 348, 38 Am. Rep. 434; Belloni v. Freeborn, 63 N. Y. 383. The credit obligation in the present case is stronger in its express terms than was the language used in the case to which we have called attention. It is quite true that Goodsell & Co., upon the payment of the drafts drawn for the goods which were lost, became, so far as that transaction was concerned, entitled at that time to receive the money secured to be paid by the policy of insurance. The money, however, was not then paid by the insurance company, nor was the policy taken from the possession of Brown Bros. & Co. Other transactions were had, and indebtedness incurred, and, when that indebtedness was brought into existence in favor of Brown Bros. & Co. under the terms of the credit obligation, a lien attached in their favor to the policy of insurance which it then held for the payment of such indebtedness, and the fact that at a prior time Goodsell & Co. would have been entitled to the proceeds of the policy in no wise affected the lien of Brown Bros. & Co. at the time when the money was paid by the insurance company, for an indebtedness then existed in their favor. The credit obligation provided that, when such indebtedness existed and was due, Brown Bros. & Co. might apply proceeds coming to their hands, or, if by any instrument money became payable, they became entitled to receive and apply it in discharge of such indebtedness.

Resort is had in opposition to this conclusion to the doctrine which obtains between a mortgagor and a mortgagee and an insurance company upon a policy of insurance containing the clause, "loss if any payable to the mortgagee as interest may appear," which policy for some reason has been rendered void and unenforceable. These cases simply hold that the mortgagee, under such circumstances, acquires no greater right to have the policy enforced than has the mortgagor. Such rule, however, has no application to the present case. No question arises as to the validity of the policy of insurance, nor as to the right of the parties to enforce it. The loss had occurred, and the liability of the insurance company to pay the sum of money had become fixed. It was payable to some one, and presumptively to the person holding the policy. It was security for the payment, and the money could only be had by a surrender of the policy. Under such circumstances, it could make no possible difference, as between these parties, whether the money which was paid came from a loss sustained under the terms of the policy, or was paid upon any other security held by Brown Bros. & Co. They had the right to make the application in either case. Upon the security they had a lien for the payment of the indebtedness, and questions relating to the insurable interest of a party, or his disability in any other respect, are entirely aside of any question presented by this case, for here the controversy is over money which was paid, and not as to any rights or disabilities which might have existed between the parties at the time respecting the insurability of either. We are of opinion, therefore, that the learned referee was in error in the construction which he placed upon the credit obligation, and that, under the proofs and the stipulation, Brown Bros. & Co. became entitled to share in the moneys paid upon the policy of insurance

proportionately with the other bankers holding the other policies of insurance.

As the facts upon which Brown Bros. & Co. base their right to the fund are undisputed, it follows that the judgment of the referee should be reversed, and judgment should be ordered in favor of Brown Bros. & Co. for their proportionate amount of the fund, with costs of this appeal as against V. K. McElheny, Jr., as assignee.

O'BRIEN, INGRAHAM, and McLAUGHLIN, JJ., concur.

VAN BRUNT, P. J. I concur in result. I am of opinion that a lien existed, independent of the agreement.